# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | |
|---|---|
| IN RE: CONFLICT OF INTEREST OF THE OFFICE OF THE PHILADELPHIA DISTRICT ATTORNEY, | : No. 125 EM 2019<br>:<br>:<br>:<br>:<br>: |
| PETITION OF: MAUREEN FAULKNER, WIDOW OF DECEASED POLICE OFFICER DANIEL FAULKNER | :<br>:<br>:<br>: |

## CONCURRING STATEMENT

**JUSTICE DOUGHERTY**                          **FILED: December 16, 2020**

Petitioner Maureen Faulkner, the widow of deceased Philadelphia Police Officer Daniel Faulkner, has asked this Court to invoke its extraordinary King's Bench powers and disqualify the Philadelphia District Attorney's Office ("DAO") from any further involvement in the matter of *Commonwealth v. Wesley Cook*, *a/k/a Mumia Abu-Jamal*, CP-51-CR-0113571-1982, "one of the most polarizing criminal cases in Philadelphia history, the nation, and perhaps worldwide[.]" PCRA Court Opinion, 12/27/2018, at 7. Consistent with the recommendation of the Special Master that we earlier appointed to investigate the alleged conflicts of interest that lie at the heart of petitioner's King's Bench request, the Court today declines petitioner's invitation to throw the DAO off the case and replace it with the Office of Attorney General ("OAG"). I write to elucidate my reasons for joining the Court's decision not to intervene any further at the present time, but also to address some of the troubling claims raised by petitioner — claims that may require closer judicial scrutiny should the DAO seek to continue its representation of the Commonwealth in any future proceedings in Abu-Jamal's case.

**A.**

A brief background is necessary to grapple with the rather unusual legal issues presented in this matter. Nearly forty years ago, in 1981, Officer Faulkner made a routine car stop in Center City Philadelphia. The driver of the vehicle was William Cook, Mumia Abu-Jamal's brother. While Officer Faulkner attempted to handcuff Cook, Abu-Jamal ran across the street and ambushed Faulkner from behind, shooting him once in the back. Although Faulkner was able to return a single shot which struck Abu-Jamal in the chest, he subsequently fell to the ground. Abu-Jamal then stood over the fallen officer and shot him four more times at close range, including once through the center of his face. Within seconds, Robert Chobert, a cab driver who witnessed the shooting, flagged down officers who were responding to Faulkner's earlier radio request for assistance to transport Cook. The responding officers found Abu-Jamal slumped against the curb in front of Cook's car, his emptied gun nearby. Two other pedestrians who had also witnessed the murder identified Abu-Jamal as the perpetrator, and two more witnesses later overheard him make a statement at the hospital to the effect he had "shot him" and "hope[s] the m*****f***** dies." *See Commonwealth v. Abu-Jamal*, 555 A.2d 846, 848 (Pa. 1989); *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 92 (Pa. 1998).

A jury convicted Abu-Jamal of first-degree murder in 1982 and sentenced him to death the following year. From that point forward, Abu-Jamal's case has undergone a tortuous and infamous history spanning four decades and involving numerous appeals in state and federal courts. *See Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1265 (Pa. 2008). Of note, in 2011, Abu-Jamal secured vacatur of his death sentence pursuant to a federal habeas corpus action. *See Abu-Jamal v. Sec'y, PA Dep't of Corr.*, 643 F.3d 370 (3d Cir. 2011). Rather than continue to pursue a sentence of death following the federal court's decision, the DAO, led by then-District Attorney R. Seth Williams, agreed to a life

sentence for Abu-Jamal. This decision was made in consultation with petitioner, who "could not take the notoriety anymore" and did not want to endure the hardship of sitting through another months-long sentencing proceeding for Abu-Jamal. Video Hearing, 5/18/2020, at 3:45:00-3:46:06.

But petitioner's hopes for finality did not last long. In an August 2016 petition filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§9541-9546, Abu-Jamal sought *nunc pro tunc* reinstatement of his appellate rights with respect to four previous unsuccessful PCRA petitions, on the basis that former Chief Justice Ronald D. Castille failed to recuse himself from those appeals. *See Williams v. Pennsylvania*, ___ U.S. ___, 136 S.Ct. 1899 (2016) (Chief Justice Castille's failure to recuse where he earlier had significant, personal involvement as District Attorney in a critical decision regarding the defendant's case gave rise to an unacceptable risk of actual bias under the Due Process Clause and constituted structural error). The DAO, under the leadership of now-District Attorney Lawrence Krasner, opposed Abu-Jamal's facially untimely fifth petition seeking *Williams*-based relief. However, after the PCRA court ruled in Abu-Jamal's favor and reinstated his *nunc pro tunc* appellate rights, the DAO ultimately declined to appeal that decision in spite of its shaky legal foundation. Meanwhile, Abu-Jamal sought to effectuate the grants of *nunc pro tunc* relief ordered by the PCRA court by filing a notice of appeal to the Superior Court from the denials of his prior PCRA petitions. *See Commonwealth v. Wesley Cook, a/k/a Mumia Abu-Jamal*, No. 290 EDA 2019.[1]

---

[1] The actual remedy directed by the PCRA court was that Abu-Jamal "be permitted to reargue his appeal[s] before the Pennsylvania Supreme Court." Supplemental PCRA Court Opinion, 3/26/2019, at 13. But since those prior PCRA appeals reached this Court only because Abu-Jamal was then serving a sentence of death, *see* 42 Pa.C.S. §9546(d), and he was later resentenced to life imprisonment in 2012, he filed these *nunc pro tunc* appeals in the Superior Court.

Before those reinstated appeals were resolved in the Superior Court, the DAO informed the PCRA court that District Attorney Krasner had personally discovered several boxes of files in Abu-Jamal's case that had not been turned over to the court pursuant to its previously-issued discovery order pertaining to Abu-Jamal's fifth PCRA petition. The DAO then made the files available to Abu-Jamal's attorneys for review. Based on that review, Abu-Jamal filed a motion for remand in the Superior Court, alleging the discovery of new evidence including, *inter alia*, a letter which supposedly shows "the prosecution promised its most important witness [(Chobert)] money in exchange for his testimony." Application for Remand, 9/3/2019, at 3. The DAO responded that, while it presently took no position on the relevance or significance of any newly-discovered material found within the six boxes of files District Attorney Krasner had unearthed, it did "not oppose a remand so that the documents may be presented to the PCRA court." Response to Application for Remand, 9/17/2019, at 3. A few days later, the Superior Court issued an order noting it would defer the remand request to the merits panel.

News that the DAO had conceded to a remand to the PCRA court in Abu-Jamal's case was not well taken by petitioner. Consequently, on September 19, 2019, she filed a petition to intervene in the pending appeal before the Superior Court. Claiming the DAO had conflicts of interest preventing it from adequately representing the Commonwealth, petitioner asked the Superior Court to remove the DAO and substitute the OAG as the prosecuting authority. Abu-Jamal opposed the intervention request, maintaining that private citizens, even victims, lack standing to intervene in criminal proceedings. The DAO similarly argued petitioner could not be considered an aggrieved person who could raise the conflict of interest claim; it further suggested the proper forum for her to raise her claim for the first time was the PCRA court, not the intermediate appellate court.

Apparently, the Superior Court credited at least one of these arguments, as it denied petitioner's request to intervene without explanation.

Petitioner then turned to this Court in a last-ditch effort to seek the disqualification of what she views as an office "rife with conflicts of interest that undermine the integrity of the adversarial system, and raise clear questions of appearances of impropriety that will vitiate the public's faith in justice being done." King's Bench Petition at 15. To that end, she filed the present petition requesting the Court to "exercise its King's Bench authority by ordering the [DAO] to refer the prosecution of the [*Abu-*]*Jamal* matter to the [OAG.]" *Id*. at 6. In support of her atypical request, petitioner identifies a litany of circumstances that she argues demonstrates the DAO "suffer[s] from undeniable personal conflicts of interest which are so obvious and so incendiary that [its] continued representation of the Commonwealth all but guarantees a biased and unjust adjudication of the [*Abu-*]*Jamal* case." *Id*. at 2. I briefly recount some of those allegations.

Petitioner initially asserts the DAO's failure to contest Abu-Jamal's remand petition "was tantamount to refusing to carry out the District Attorney's responsibility to enforce the law and defend the prosecution of a stone-cold murderer." *Id*. at 5. Relatedly, petitioner faults the DAO for failing "to do even the most cursory investigation into the bases for [Abu-]Jamal's requested new PCRA hearing" — most notably, the DAO did not contact Joseph McGill, the trial prosecutor whose "personal notes and correspondence are directly at issue in [Abu-]Jamal's remand request." *Id*. at 23. According to petitioner, if the DAO was "intending to fairly evaluate whether an opposition to [Abu-]Jamal's requested remand was appropriate, evaluating what McGill had to say about this evidence would be critical." *Id*.[2] Also relative to the DAO's agreement to Abu-Jamal's

---

[2] Indeed, petitioner secured an affidavit from McGill in which he explains that he received the Chobert letter "**after trial** and **after** [Chobert] had testified truthfully," and that it merely

remand request, petitioner explains that after she organized a rally in front of the DAO to protest that decision, "Krasner's official, City-paid spokesperson posted [the following] Tweet mocking the protestors because of their race[.]" *Id.* at 22.



Beyond the DAO's handling of Abu-Jamal's pending Superior Court appeal and PCRA remand request, petitioner contends District Attorney Krasner "has staffed his office with a cadre of individuals who not only are long-time and public advocates for [Abu-]Jamal's innocence, but also include [Abu-]Jamal's appellate lawyer[.]" *Id.* at 27. In this respect, petitioner refers to Paul George, Esquire, the Assistant Supervisor of the DAO's Law Division, which comprises the Appeals and PCRA Units, among others. More than a decade ago, petitioner tells us, "George signed and filed an appellate brief on behalf of [Abu-]Jamal in which George asserted that the conviction must be overturned as new facts establish that the prosecution . . . was a product of fraud and false evidence

reflects Chobert's mistaken belief "that he was owed money for lost time from work." Affidavit of Joseph McGill, 11/18/2019, at 3 (emphasis in original).

deliberately orchestrated by members of the Philadelphia Police Department." *Id*. at 17 (internal quotations and citation omitted). Petitioner argues that George cannot simply be screened from Abu-Jamal's case while his subordinates "continue to defend what [George] considers to be criminal acts." *Id*. at 2. This is particularly true, from petitioner's perspective, since George "is responsible for [ ] performance evaluations, opportunities for promotion, salary increases and other fundamental terms of [ ] employment" for the ADAs assigned to handle Abu-Jamal's case within the PCRA and Appeals Units. *Id*. at 16; *see id*. at 27-28 ("the assigned ADA will have to proceed 'against' [Abu-]Jamal with the knowledge that his direct supervisor and many of his high ranking [DAO] colleagues have long voiced the belief — some in filed public pleadings — that [Abu-]Jamal should be free and that his conviction was based on criminal police misconduct").

Petitioner further asserts District Attorney Krasner is personally biased, pointing to his comment to the media where he accuses some "former prosecutors of being 'war criminals[.]'" *Id*. at 3; *see id*. at 18-19 and n.22, *citing* Del Quentin Wilber, *Once Tough-On-Crime Prosecutors Now Push Progressive Reforms*, LOS ANGELES TIMES (Aug. 5, 2019) ("In interviews, he called McSwain, the U.S. attorney, a 'liar,' and former prosecutors in his office 'war criminals.'"). Petitioner specifically notes that "[t]wo of the lawyers Krasner has characterized as 'war criminals' . . . both worked on defending the guilty verdict in the [*Abu-*]*Jamal* case" through their former roles supervising the DAO's Appeals Unit and Law Division, respectively. *Id*. at 19. As well, in a supplement to her petition, petitioner informs us that she discovered information showing that District Attorney Krasner was associated with the National Lawyers Guild ("NLG"), which lists Abu-Jamal as a member. The NLG, petitioner explains, formed a group of five attorneys, including Krasner, to represent individuals arrested for protesting at the 2000 Republican National Convention, some of whom advocated for Abu-Jamal's release.

Finally, petitioner highlights several other staffing choices made by District Attorney Krasner that she believes reveals a bias in favor of Abu-Jamal. For instance, petitioner references DAO employee Jody Dodd, who previously served as the office manager in Krasner's private law firm, as having been an "active member" of a group that advocated for Abu-Jamal's exoneration. *Id.* at 3.

In light of this lengthy list of perceived conflicts of interest, and since "there is no procedural avenue for the public to object," petitioner urges that "this Court must exercise its King's Bench authority to rectify such a threat to the integrity of the judicial process." *Id.* at 24; *see id.* at 6 ("since both Krasner and [Abu-]Jamal are apparently satisfied to march side-by-side through the legal proceedings while ignoring the current conflicted representation and the numerous appearances of impropriety, the ethical crisis may never be judicially addressed unless this Court acts"); *see also* OAG's Response to King's Bench Petition at 3 ("Unlike the usual conflict of interest challenge, the kind of conflict identified in the King's Bench petition does not prejudice either party to the underlying litigation. Rather, the justice system itself is adversely affected, along with those it is intended to protect."); *id.* at 6 ("The governmental activity at issue here is uniquely within the role of the judiciary.").

Faced with these serious allegations which, if true, could adversely affect the integrity of the justice system, we appointed the Honorable John M. Cleland as a Special Master and tasked him with conducting such hearings or other proceedings as necessary "to determine if the [DAO's] participation in the underlying criminal case . . . presents the appearance of a conflict of interest such as to impede the fair and impartial administration of justice." Order, 3/3/2020, at 1.[3] In so doing, we afforded Judge Cleland significant

---

[3] I commend Judge Cleland for dispatching his assigned duties with haste and the same level of diligence and professionalism that he consistently demonstrates when called upon to aid this Court from time to time.

discretion in determining how best to conduct the inquiry, but instructed that he "shall consider the various allegations of conflict referenced in the petitioner's King's Bench Petition and Supplement to King's Bench Petition[.]" *Id.* at 2. In service of that mandate, Judge Cleland permitted the parties to engage in limited discovery pertaining to the following four issues: "(a) Whether it is the intention of the DAO to defend the conviction in the pending PCRA proceeding; (b) Whether the DAO has any evidence to support or justify a decision by the DAO not to defend the conviction; (c) What the strategic or legal basis was for consenting to a remand to the PCRA court; ([d]) What the strategic or legal basis is for not interviewing Joseph McGill or otherwise preserving his testimony." Order, 4/7/2020, at 2.

At the conclusion of discovery, the parties submitted pre-hearing statements, 107 hearing exhibits, transcripts of four depositions, a number of affidavits, and offers of proof for 25 witnesses. Judge Cleland reviewed all of this material before scheduling a video hearing for May 18, 2020. On that date, Judge Cleland questioned petitioner, Krasner, George, Dodd, and four other DAO witnesses: Nancy Winkelman, Esquire, Supervisor of the Law Division; Tracey Kavanagh, Esquire, Supervisor of the PCRA Unit and the ADA primarily responsible for handling Abu-Jamal's post-conviction claims; Lawrence Goode, Esquire, Supervisor of the Appeals Unit; and Grady Gervino, Esquire, the ADA within the Appeals Unit tasked with handling Abu-Jamal's pending appeal before the Superior Court. Judge Cleland limited examination of the witnesses to "subjects deemed relevant to [him] and only for the purpose of clarifying information provided by any witness and deemed of concern to [him]." Order, 5/14/2020, at 5; *see also* Special Master's Report, 6/17/2020, at 8-9 ("I conducted the initial questioning of each witness, focusing on the issues I believed required explanation or clarification beyond what had been already produced for

my review."). Following the hearing, the parties were permitted to, and indeed did, file proposed findings of facts and conclusions of law.

Thereafter, on June 17, 2020, Judge Cleland submitted to this Court his report, which explains that since the supposed focus of the King's Bench petition is on two decisions made by the DAO — "not opposing a defense-requested remand to the PCRA court . . . and not interviewing McGill" — discovery was limited to those issues. Special Master's Report, 6/17/2020, at 7. Ultimately, the report concludes "those two decisions rest on reasonable legal and strategic foundations" and that "no evidence has been presented that supports a finding that the District Attorney or his assistants do not intend to defend the conviction." *Id.* at 2. *See also* Krasner Deposition, 4/22/2020, at 26 ("the information that I have reviewed suggests to me that Mumia Abu[-]Jamal is guilty of this crime, that he committed a homicide"); *id.* at 28 ("I believe that this conviction should be maintained, not only because I think it reflects accurately that [Abu-Jamal] is guilty, but it should be maintained because I see nothing to date indicating a reversal is appropriate"). From there, the report proceeds to set forth and analyze nine "essential allegations . . . supporting the contention that the DAO is beset by clear and unambiguous conflicts, as well as appearances of impropriety." Special Master's Report, 6/17/2020, at 9 (internal quotations and citation omitted). But Judge Cleland determines petitioner "failed to establish the existence of a direct conflict of interest, which compromises the ability of the District Attorney or his assistants and staff to carry out the duties of his office[,]" and likewise failed to establish "the existence of an appearance of impropriety that would compromise a reasonable person's confidence in the capacity of the District Attorney or his assistants and staff to serve the fair and impartial administration of justice[.]" *Id.* at 1-2. He thus recommends we dismiss petitioner's King's Bench petition.[4]

---

[4] Petitioner filed objections to the Special Master's report to which the DAO responded.

**B.**

Initially, it is important we acknowledge the proper scope and standard of review over this matter, including over the Special Master's Report. Generally speaking, "[b]y its 'supreme' nature, the inherent adjudicatory, supervisory, and administrative authority of this Court at King's Bench 'is very high and transcendent.'" *In re Bruno*, 101 A.3d 635, 669 (Pa. 2014). For that reason, "[t]he exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; the Court may employ any type of process or procedure necessary for the circumstances." *Id*. Moreover, and critically, we have held that "in matters such as these where we have exercised plenary jurisdiction and have not relinquished that jurisdiction to the tribunal which is in essence acting as a special master for this Court, **our review must be *de novo*.**" *Annenberg v. Commonwealth*, 757 A.2d 338, 342-43 (Pa. 2000) (emphasis added); *accord Commonwealth v. Banks*, 29 A.3d 1129, 1134 (Pa. 2011) ("In other matters where we have invoked plenary jurisdiction, and appointed a trial judge to essentially act as a master while retaining jurisdiction, we have concluded that our review is *de novo*."). When addressing a special master's factual findings, "we will afford them due consideration," but they "**are not binding on us**[.]" *Annenberg*, 757 A.2d at 343 (emphasis added).

Here, we deemed it appropriate to "appoint a special master to investigate the matters referenced in the King's Bench Petition [ ] and to make recommendations to this Court." Order, 2/24/2020, at 1. Significantly, in doing so, we made clear that "[j]urisdiction is retained." Order, 3/3/2020, at 2. By declining to relinquish our jurisdiction to the Special Master, we signaled our intent to maintain *de novo* review over this matter in its entirety, consistent with our practice in other matters in which we invoked plenary jurisdiction and appointed a special master to assist the Court in performing its various functions. *See In*

*re Thirty-Fifth Statewide Investigating Grand Jury*, 112 A.3d 624, 633 n.3 (Pa. 2015) (Baer, J., concurring) (collecting cases in which we appointed a special master). As a result, although we must give Judge Cleland's factual findings due consideration, they quite simply "are not binding on us[.]" *Annenberg*, 757 A.2d at 343. And to the extent Judge Cleland has provided conclusions of law based on his factual findings, those conclusions are, as plainly expressed in our prior order, "recommendations." Order, 2/24/2020, at 1; *see also In re Thirty-Fifth Statewide Investigating Grand Jury*, 112 A.3d at 633 (Baer, J., concurring) ("The function of a special master is to gather necessary factual information, consider pertinent legal questions, and provide the court with recommendations.") (footnote omitted). With this understanding of the applicable standards, I proceed to address the claims raised by petitioner.

## C.

As noted at the outset, I join the Court's decision to adopt the Special Master's recommendation to dismiss petitioner's King's Bench petition. However, upon my own *de novo* review of the record and the claims presented, I believe petitioner has actually made a colorable showing that the DAO is afflicted by (at the very least) the appearance of a conflict of interest such as to impede the fair and impartial administration of justice in Abu-Jamal's case.

The conflict alleged in this case is highly unusual, in that it suggests an elected District Attorney and his office are biased **in favor of** a convicted criminal defendant. This reality undoubtedly makes the conflict, if there is one, more difficult to identify and confirm. Indeed, as the OAG cogently explains, "[c]onflicts such as that averred here . . . will not often manifest themselves as failures or refusals to prosecute. The effect of an improper conflict of interest will generally be less blatant." OAG's Response to King's Bench Petition at 6-7 n.2 (internal quotations omitted); *see also id.* at 3-4 (Where the claim is

"that counsel for the prosecution [is] conflicted by bias **in favor of** the defendant, neither counsel nor the defendant would have any interest in raising it. To the contrary, the defendant would wish to preserve pro-defense bias for his personal benefit, while counsel for the prosecution would wish to avoid judicial review of his conduct.") (emphasis in original). Despite these circumstances, and the uphill battle they represent, I find that petitioner has identified a number of circumstances that strongly suggest a less blatant conflict of interest does in fact exist.

First, I question the DAO's decision to withdraw its appeal from the PCRA court's order reinstating Abu-Jamal's appellate rights *nunc pro tunc*. Although the DAO has throughout this litigation emphasized that it opposed Abu-Jamal's *Williams*-based post-conviction claims, it has proffered no explanation, strategic or otherwise, in support of its decision to terminate the Commonwealth's appeal from the PCRA court's unfavorable ruling. This is significant because, had the DAO succeeded on appeal in showing that the PCRA court erred in reinstating Abu-Jamal's appellate rights *nunc pro tunc*, that would have put an end to the current round of litigation entirely, which is precisely what the DAO claims is its overarching objective.

The DAO's concession to Abu-Jamal's remand request in the Superior Court is similarly questionable. Strategic reasons aside, the fact remains that the remand request to which the DAO agreed is contrary to the procedure this Court has specified for such matters. *See Commonwealth v. Lark*, 746 A.2d 585 (Pa. 2000) (providing that, when newly discovered evidence claims arise during a PCRA appeal, the proper course is for the petitioner to file a new PCRA petition upon resolution of the pending matter); *accord Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002). And despite touting himself as the final decision-maker for all strategic choices made in Abu-Jamal's litigation, District Attorney Krasner also candidly admitted during his deposition that in formulating his decision not

to oppose the remand request, he had not familiarized himself with the applicable legal standards. *See, e.g.*, Krasner Deposition, 4/22/2020, at 44 ("I wasn't so focused on some sort of an academic analysis[.]"). While I have no doubt that District Attorney Krasner credibly testified to his sincere belief that it would be in the best interest of all parties to concede to a remand under the circumstances, it is still disconcerting to me that a District Attorney would make such an important decision in this high-profile case without first considering whether the decision comports with the law.[5]

More troubling still are the comments District Attorney Krasner has made to the media suggesting that several former prosecutors who previously worked on Abu-Jamal's case are "war criminals." Although the article in which Krasner's remark appeared did not specifically mention Abu-Jamal or the two former DAO supervisors who previously

---

[5] This is not the only instance in which District Attorney Krasner has mischaracterized the relevant law in this matter. For example, I note that, in defending the decision not to interview McGill prior to agreeing to the remand request, Krasner repeatedly asserted that "there's some case law that can be interpreted to say that the prosecution really should not talk to any witnesses in a PCRA matter." Krasner Deposition, 4/22/2020, at 20; *see also id.* at 53 ("there are a couple of cases, one of which instructs that there should not be consultation with the defense attorney by the prosecutor on a PCRA"). These statements undoubtedly refer to our decision in *Commonwealth v. King*, 212 A.3d 507 (Pa. 2019). There, we held that now-retired Philadelphia Court of Common Pleas Judge M. Teresa Sarmina did not abuse her discretion by barring the Commonwealth from privately interviewing **the defendant's trial counsel** under the unique circumstances of that case, which included "allegations that trial counsel refused to cooperate with [PCRA counsel] in preparation for an evidentiary hearing but, at the same time, counsel purportedly was cooperating with the Commonwealth's preparation for the same hearing." *Id.* at 514. On its face, *King* has no applicability here since McGill was the **prosecutor**, not Abu-Jamal's **defense counsel**. In any event, District Attorney Krasner's understanding of our holding in *King* even as it pertains to defense counsel is equally wrong, as our opinion expressly states that "nothing in the law specifically prohibits the Commonwealth from interviewing trial counsel when that counsel's representation of a PCRA petitioner is under scrutiny[.]" *Id.* at 513; *see also id.* at 518 (Mundy, J., concurring) (emphasizing "the holding should be narrowly construed based on the unique set of circumstances before us" and "not be read to stand for the proposition that the Commonwealth is generally prohibited from communicating with trial counsel in preparation for an evidentiary hearing").

handled Abu-Jamal's appeals, the implication was obvious; Krasner practically admitted as much throughout these proceedings. *See* Video Hearing, 5/18/2020, at 2:13:38-2:14:12 (explaining his "war criminals" quote referenced a "joke about certain individuals in the DA's Office who had run off and been hired by a different law enforcement agency"); *id.* at 3:08:39-3:09:19 (discussing the circumstances of the former DAO supervisors' departure from the DAO and subsequent hiring by the OAG). *See also* Chris Brennan, *Philly DA Larry Krasner Clashes with Pa. AG Josh Shapiro — Again — Over Alleged Power Grab*, PHILADELPHIA INQUIRER (Aug. 9, 2019) ("DA's staffers now call the Attorney General's Office 'Paraguay,' Krasner told Clout, a reference to the South American country where Nazis took refuge after World War II."). While District Attorney Krasner and the DAO shrug off the comment as "hyperbolic humor[,]" Answer to King's Bench Petition at 22, there are presumably many others out there who would just as quickly deem the reference highly offensive.[6] Regardless, such comments — much like the DAO's spokesperson's racially-charged tweet aimed at petitioner and her supporters — are utterly inappropriate, have no place in our ordered system of justice, and potentially evince a bias against those who have sought over the years to uphold Abu-Jamal's conviction.[7]

---

[6] Along similar lines, I observe the District Attorney has adopted an especially defensive posture to the instant judicial inquiry, including suggesting the motives behind it are improper. *See id.* at 2:24:23-2:24:37 ("this litigation itself is a delay"); *id.* 2:24:37-2:24:45 ("the instigation of these proceedings, frankly, I consider to be political"); *see also* Answer to King's Bench Petition at 35 (suggesting petitioner is trying to "thwart the will of the people" who elected the District Attorney). But in my view, far from being some sort of political witch hunt, the present proceedings have simply brought to this Court's attention viable claims of a serious conflict of interest that otherwise might have gone unnoticed — allegations which strike at the heart of our role as the ultimate authority over attorney conduct and the judiciary.

[7] I fully agree with Justice Wecht that "[t]he fact that we, like others, might take personal offense to [District Attorney] Krasner's statements cannot play a role in our adjudicative function[,]" Concurring Statement (Wecht, J.) at 14, and I stress that it has played no such

Yet another arguably disqualifying conflict in this matter involves George's role as the Assistant Supervisor of the Law Division. No one disputes that George has an actual conflict of interest due to his prior representation of Abu-Jamal. And petitioner asserts that "[n]o level of screening can eliminate this conflict[.]" King's Bench Petition at 2. The Special Master disagrees, however, concluding instead that "George has been screened from involvement in the underlying litigation, and there is no evidence that he has been involved in making or influencing any legal or strategic decisions." Special Master's Report, 6/17/2020, at 15.

In terms of the facts, there is actually some evidence in the record supporting the notion that George's screening from the Abu-Jamal litigation has been insufficient. *See, e.g.*, George Deposition, 4/20/2020, at 24 (asserting Abu-Jamal's case "would come up from time to time in conversation" though he would "immediately say I can't participate in this"); *id.* at 25 (expressing uncertainty regarding how many of the approximately sixty lawyers within the Law Division he had actually told about his screening); *id.* at 31 (admitting no restrictions have been imposed on his access to an office-wide electronic database of files). Moreover, as the following exchange makes clear, there was no formal policy in place regarding George's screening beyond his own self-policing:

**Counsel:**    Do you know if anybody else in the DA's office was involved in making sure that the screening of you from the Abu[-]Jamal case was an effective screen?

**George:**    I don't know.

**Counsel:**    No one ever discussed it with you that they were part of the screening process or were monitoring the screening to make sure that it was effective?

---

role here. But we cannot just dismiss the District Attorney's remarks, either, as petitioner persuasively asserts they demonstrate an improper bias with respect to Abu-Jamal's case and those who have been involved with it.

**George:**      No.

**Counsel:**      Did you ever receive any written directive from anybody else in the DA's office regarding the steps you should take to be screened?

**George:**      No.

**Counsel:**      Or how most effectively to screen you?

**George:**      No.

. . . .

**Counsel:**      Has anybody ever described for you what steps should be taken to effectively screen yourself from the Abu[-]Jamal case?

**George:**      Not with respect to that particular case[.]

*Id.* at 27-28. While I recognize all DAO employees who testified in this matter uniformly stated they had no interaction with George regarding Abu-Jamal's case, and the Special Master found no reason to doubt those assertions, it does not alter the fact that the record reveals legitimate reasons to believe George's self-imposed screening procedure has been inadequate.[8]

---

[8] Justice Wecht asserts that I have "elect[ed] to forego the requirement that we afford factual findings 'due consideration[.]'" Concurring Statement (Wecht, J.) at 13 (citation omitted). I respectfully disagree. In point of fact, I have meticulously reviewed and considered all of the voluminous material contained in the record, including all testimony and every finding and recommendation made by the Special Master, as our *de novo* standard of review demands. But it is important to recall that Judge Cleland, pursuant to the wide discretion we afforded him, limited discovery in this matter to only four topics. *See supra* at 9, *citing* Order, 4/7/2020, at 2. Notably, the implications of George's role as a current high-ranking DAO supervisor, when he was previously Abu-Jamal's counsel, was not one of them. I therefore believe that this issue — perhaps more than any other in this case — warrants the closer examination that this concurring statement has afforded it. The fact that I have undertaken such an intensive review of the record with respect to this claim, as we are required to do, obviously does not mean that I have failed to give Judge Cleland's findings the consideration to which they are entitled.

I believe there is in any event substantial force to petitioner's claim that no level of screening is capable of removing George's conflict given that he "is directly involved with providing performance reviews for **all** members of the PCRA and Appeals Units, including those actively working on the current [*Abu-*]*Jamal* appeal[.]" Petitioner's Objections to Special Master's Report at 7 (emphasis in original). As petitioner correctly notes, there is some precedent suggesting that screening and transferring a case to a conflicted prosecutor's subordinates is not enough when the subordinate remains subject to the superior prosecutor's "guidance, control, and supervision." *Commonwealth v. Eskridge*, 604 A.2d 700, 701 (Pa. 1992). And "[w]hile it is true that *Eskridge* . . . involved conflicts of the elected district attorney," I believe petitioner forwards a viable argument that "the same rationale should apply to George given his high ranking role in the [ ] DAO and his continuing involvement in performance evaluations." Petitioner's Objections to Special Master's Report at 8. At a minimum, petitioner appears to have identified an issue of first impression ripe for judicial review.[9]

To be clear, I acknowledge it is subject to reasonable debate whether any of the above circumstances (with the exception of George's conceded conflict) definitively proves an objective conflict of interest. Nor do I in any way mean to suggest that most

---

[9] The fact that this allegation concerns a legal issue of first impression renders any deference to the Special Master's conclusions particularly ill-suited to the task. I note as well that Justice Wecht adopts the Special Master's conclusion that "ADA George worked in tandem with the DAO's ethics officer to ensure that no conflict of interest presented itself." Concurring Statement (Wecht, J.) at 16-17. But the record actually undermines this purported finding, and highlights precisely why we cannot take lightly our responsibility to review the entire record *de novo. See* George Deposition, 4/20/2020, at 27-28 ("What happened with respect to this [Abu-]Jamal case, however, is that I'm the one that announced it within the first days of my taking my position before I even knew that Mr. Glazer [the ethics officer] was involved in monitoring and screening and so forth.").

discretionary actions taken by a district attorney's office should ordinarily be subject to judicial review. *Cf. Commonwealth v. Buonopane*, 599 A.2d 681 (Pa. Super. 1991) (absent a finding of bad faith, the separation of powers doctrine requires courts to refrain from reviewing a prosecutor's discretionary acts). But, taken together, the circumstances surrounding this case paint a disturbing picture. When further considered alongside the ever-growing number of documented instances suggesting a dereliction of duty on the DAO's part with respect to other high-profile homicide cases, *see, e.g.*, *Commonwealth v. Brown*, 196 A.3d 130, 149 (Pa. 2018) (rejecting DAO's improper attempt "to implement a different result [in a death penalty case] based upon the differing views of the current office holder"); *Wharton v. Vaughn*, No. 01-6049, 2020 WL 733107 (E.D. Pa., filed Feb. 12, 2020) (Goldberg, J.) (appointing the OAG to serve as *amicus curiae* due to the DAO's failure to independently investigate claim it sought to concede, and in light of doubt over whether the DAO had contacted the victim's family in accordance with its statutory obligations), one might easily see why petitioner fears District Attorney Krasner and his office are perhaps not capable of objectively serving the interests of the Commonwealth in Abu-Jamal's case.

Notwithstanding all of this, I conclude our further intercession is not necessary at this time. This is because the procedural landscape of this case is almost certain to change due to a significant intervening development in the law. We recently decided *Commonwealth v. Reid*, 235 A.3d 1124 (Pa. 2020), wherein we held the *Williams* decision does not provide an exception to the PCRA's timeliness requirements, and that *nunc pro tunc* appeals reinstated pursuant to *Williams* are subject to *sua sponte* quashal. By all appearances, Abu-Jamal's case falls squarely in this category. *Compare* PCRA Court

Opinion, 12/27/2018, at 13 (declaring it exercised jurisdiction over Abu-Jamal's facially untimely fifth PCRA petition because it found the holding in *Williams* "constitutes a newly-discovered fact that was previously unknown") *with Reid*, 235 A.3d at 1148 ("neither the *Williams* decision itself nor the legal conclusions contained therein constitute a new fact"). In fact, the reinstatement of Abu-Jamal's appellate rights in some ways appears to be even further beyond the pale than in *Reid*, as the PCRA court explicitly found "no evidence of record that shows that Castille was involved in a critical decision in [Abu-Jamal's] underlying case." *Id.* at 26. That being the case, *Williams* appears to be wholly inapplicable to Abu-Jamal, and thus could not possibly have supplied a basis for establishing jurisdiction in the PCRA court. *See Reid*, 235 A.3d at 1154 n.19 (limited rule "announced in *Williams* is that 'under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case'"), *quoting Williams*, 136 S.Ct. at 1905. *See also Commonwealth v. Jones*, 239 A.3d 18, 19 (Pa. 2020) (Donohue, J., concurring) ("Because Castille lacked involvement in the actual prosecution against Jones that resulted in the death sentence, *Williams* is not implicated."). I therefore see no pressing need for any additional action on our part at this stage.

Of course, it goes without saying that even once Abu-Jamal's presently pending appeal is resolved, a new round of post-conviction proceedings in his case will almost certainly follow, based on the material that was recently disclosed to him by the DAO. But unlike here, where petitioner had no remaining option but to resort to this Court's King's Bench jurisdiction, other statutory mechanisms for removing the DAO would be available in any future PCRA proceeding. For example, pursuant to Section 732-205 of the

Commonwealth Attorneys Act, the President Judge of the Philadelphia Court of Common Pleas could, if she believed it proper, request the Attorney General's intervention. *See* 71 P.S. §732-205(a)(5). Or the Attorney General himself could petition the PCRA court to permit the OAG to supersede the DAO. *See* 71 P.S. §732-205(a)(4).[10] And lastly, of course, District Attorney Krasner could simply refer the case to the OAG based upon "the potential for an actual or apparent conflict of interest on the part of the district attorney or his office." 71 P.S. §732-205(a)(3). This latter path would undoubtedly alleviate all conflict concerns, remove the likelihood of further litigation on this issue, and advance the District Attorney's asserted desire for a fair, full, and expedient resolution of Abu-Jamal's claims.

### D.

Judicial removal of a District Attorney, an elected constitutional officer, is never a small matter. Still, this Court has a constitutional imperative to "conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system[.]" *In re Bruno*, 101 A.3d at 675; *see also* Special Master's Report,

---

[10] The OAG implies a sense of hesitation with respect to invoking Section 732-205(a)(4) because the conflict alleged by petitioner has not manifested itself in a way that proves "the district attorney has failed or refused to prosecute[.]" 71 P.S. §732-205(a)(4). *See* OAG's Reponses to King's Bench Petition at 6-7 n.2. This raises an interesting and novel issue which is likely worthy of further consideration by this Court at some future point. In any event, as I see things, even an unsuccessful petition filed by the OAG in the trial court would serve to place both the judiciary and the District Attorney on notice that the Attorney General believes there may be grounds for disqualification, which in turn would allow those parties to consider whether it might be appropriate to pursue one of the other statutorily-prescribed grounds for removal. *See generally Commonwealth v. Mulholland*, 702 A.2d 1027, 1037-38 (Pa. 1997) (where trial court believes district attorney has a conflict, "the proper course of action [is] for the trial judge, through the president judge, to request the attorney general's intervention in accordance with the statutory provisions of the Commonwealth Attorneys Act").

6/17/2020, at 23 ("Under unusual circumstances, a petition to remove a prosecutor in a given case because of the appearance of a conflict of interest may be appropriate."); *Eskridge*, 604 A.2d at 701 (prosecutor must be "an administrator of justice with his mind on the public purpose, not [ ] an advocate whose judgment may be blurred by subjective reasons") (internal quotations and citation omitted). Fulfilling that duty requires even more vigilance where the alleged prosecutorial bias is in favor of the defense, since the defendant naturally will be incentivized **not** to raise a conflict that operates to his benefit. *See generally In Re Hickson*, 821 A.2d 1238, 1245 n.6 (Pa. 2003) (cautioning against allowing important issues to "escape judicial review entirely" where the parties would be disinclined to complain "as the conduct impacted them in a positive, rather than a negative, fashion"); *Sprague v. Casey*, 550 A.2d 184, 187 (Pa. 1988) (judiciary must be cognizant of claims that are "likely to escape judicial review when those directly and immediately affected by the complained of conduct [are] beneficially affected as opposed to adversely affected").

Here, petitioner has exposed several grave and alarming allegations concerning District Attorney Krasner and his office's ability to act impartially in this case. While I do not believe that now is the appropriate time for this Court to further explore those serious and important claims, I do wish to reiterate a salient point raised by the Attorney General: only the courts have "the power to police attorney conflicts of interest so that they do not distort judicial proceedings." OAG's Response to King's Bench Petition at 6.[11] In other

---

[11] It is true, as petitioner observes, *see* King's Bench Petition at 31-32, that "[a] district attorney shall be subject to the Rules of Professional Conduct **and** the canons of ethics as applied to judges in the courts of common pleas of this Commonwealth insofar as such canons apply to salaries, full-time duties and conflicts of interest." 16 P.S. §1401(o)

words, should the DAO seek to continue to represent the Commonwealth in this case, it

may well be encouraging more exacting judicial review of that decision in the future.

(emphasis added); *see also* Pa.C.J.C. 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."). But as the OAG persuasively explains, "even the Disciplinary Board, which might in theory eventually review a claim of attorney misconduct, has no authority to remedy any damage to the underlying case." OAG's Response to King's Bench Petition at 6. It therefore falls upon the courts to police attorney misconduct, if possible, before such conduct taints the judicial process and prejudices the administration of justice.